Good morning, Your Honors. Good morning, Council. May it please the Board. Jonathan Fountain on behalf of the respondents. Natural Life is a seller of nutritional supplements, and it utilizes the sales staff of telemarketers to sell its products. This case is about Natural Life's termination of its sales staff and rehiring of certain members of its sales staff, excluding the petitioner in this case, Ms. Strange. The Board found that Natural Life violated Section 8A.1 of the National Labor Relations Act by creating an impression of surveillance and by making a coercive statement to its employees designed to suppress employees from engaging in protected activity. Natural Life challenges those findings here. And before I go further, I'd like to reserve one minute for rebuttal. The Board's first argument is that Natural Life did not raise objections to these findings below. But Natural Life did raise its objections. The crucial question for the Court to consider is whether the Board received adequate notice of Natural Life's objections. It certainly did. Natural Life submitted exceptions to the Administrative Law Judge's decision, and those are found at SCR 1 through SCR 11. Three exceptions specifically identified the impression of surveillance and coercive statement issues. Exception number 19, found at SCR 4 to 5, identified the impression of surveillance issue. Exception number 30, found at SCR 7, identified the coercive statement issue. Exception number 33, found at SCR 8, identified both issues. The Board argues that Natural Life's exceptions were cursory and did not satisfy the rules. But we would argue that Natural Life's exceptions substantially complied with them. The exceptions identified. Can I just jump ahead to what seems to me to be one of the main issues in the case, which is the Board's finding, affirmance of the ALJ's finding that Guggia was acting with actual and apparent authority when she made the statements that she made on July 27th. Can you tell us why you think we can overturn that finding and should? Certainly, Your Honor. It appears clear from the language that Guggia herself used that she was giving a personal opinion. Guggia's statements are found at ER 579 and ER 580. Well, Counsel, we also have the tape. That's substantially more. That's true. It's not limited to those two pages. I haven't listened to the tape, but I've read the transcript, and it certainly seems to me that she went well beyond offering personal opinions. She told them that she had talked with the boss, that they were closing the office. Effectively, they were fired. And when she came back from her cruise, they would pick up again, and she hoped to be working with some of them still. But she mentioned many times the complainers and the people who were threatening to file lawsuits as not being helpful. That's true. She did say those things. But I think she was equivocal about whether she would be coming back or not. Didn't sound like she was equivocal in the least. She used the word I to refer to herself 26 times in just the three paragraphs that we cited. And she gave extensive statements about her wants and her beliefs, making aspirational and hypothetical statements, talking about who she wanted to work with. And she says, quote, if you ever want to be on my team again one day, wherever I am or whatever I'm doing, you know, I would love to have you if you fit into that criteria. So I think there's some uncertainty here about whether Natural Life was, in fact, going to reopen. The counsel didn't the hearing examiner made a decision that she wasn't credible. So why should we not accept his decision? I mean, you're kind of making a clothing argument to the hearing examiner. We're the appellate court here, and we have to accept his decision unless you offer us some reason not to. Well, and I understand your honor. And the reason I would offer not to is that, you know, as an appellate court, this court exists to do substantial justice and needs to look at the record and whether or not the hearing examiner was justified in drawing the conclusions that he drew. And what we're suggesting is that Ms. Guggia, while she may have been authorized to talk about the reasons why the sales staff is being terminated, completely went off the reservation and started talking about her personal opinions. And I think the question really is whether a reasonable employee would believe she's speaking for the company or is she speaking for herself? And I think just the way she spoke, talking about the 20 use of the word I at least 26 times. But that's one way to read. That's one way to read the evidence. But it's not the only way to read the evidence. I think that's Judge Bastian's point is that, you know, maybe if we were the trier, we might have found some of this persuasive, but we're not the trier. And, you know, is it a permissible reading of the evidence to say that when you send someone out to announce that they're being fired and she does that and then gives reasons and says, you know, maybe some of you will be hired back. And then guess what? Some of them are later hired back. Maybe the reasonable inference is that she was doing that with authority. That conclusion could certainly be drawn. Well, but then you lose. If that can be drawn under the substantial evidence standards that apply, we can't set that aside. But we would simply argue that we don't believe that the statements constitute substantial evidence that she was speaking for the company. I mean, reading the transcript of the recording, again, she's talking about her own opinions, her own beliefs. And I think it's just clear from the language she used that she was talking about her own opinions and beliefs. With respect to the impression of surveillance, Ms. Guggia spoke about the Quality Assurance Department loosening in on what was being said. And the board relies on that. However, this is a telemarketing company and it was standard operating procedure for Natural Life to loosen in on sales calls to prevent mistakes, research customer-related complaints, or issues concerning orders. Natural Life's employees were aware the calls were being monitored. So this was recording being made in the ordinary course of business, not out of the ordinary. If Natural Life employees discussed filing suit on telephone lines they knew were being monitored by the company, that's not surveillance. It's employees making statements simply in the presence of their employer. Accordingly, our position is that the board's finding on impression of surveillance is not supported by substantial evidence. The board relies on two stipulations to show that Natural Life had knowledge that its sales staff was engaged in protected activity. One stipulation is found at ER 349-350 and it states that, quote, there were complaints about office negativity and employee complaints about other terms and conditions of employment. The stipulation does not say complaints were group complaints, evidence of concerted activity, concerns of filing a lawsuit against the company, or the complaints were anything other than individualized employee grievances. I mean, that may be true as to that one piece of evidence in isolation, but of course all the evidence has to be reviewed together. And that evidence, together with the comments you made on July 27th, would seem to permit the inference that there was joint activity and that that was the basis of the actions. Well, the second stipulation is certainly talking about joint activity, but it's talking about complaints of racism and sexism that predated Ms. Strain's allegations. And because of that, we don't think it was proper for the board or the court to consider it. I understand Your Honor's point about taking the record as a whole, and we just simply don't think that the record as a whole demonstrates that there was animus or that animus was the cause of the terminations. Even when she says they have a whole conversation of people talking about a lawsuit like half an hour long, I don't want to deal with people that, you know, want to do that to me. So isn't that some evidence, together with the other items in the record, that there was joint activity about filing a lawsuit and that then the company acted based on that? Well, I certainly think it's evidence of Ms. Guggia's opinion about who she does and doesn't want to work for, but is that sufficient to show animus? I don't think so. She's not saying the company doesn't want people who want to sue to be employed. The company looks badly upon those people. She's not saying those things. She's talking about who she wants to work with. She wants to work with people who have a positive attitude, who are willing to grow and learn, and who are willing to deal with hard times. So I don't see the evidence as being sufficient to show animus. I mean, I suppose it could support a finding of animus, but I just simply don't think it rises to the level of sufficient evidence. The board refers to Guggia's statement about not wanting to work with people who are going to constantly nag. Guggia's statement did not connect nagging to any specific issue, such as filing a lawsuit. The board has to show that Natural Light both harbored animus and took its adverse employment action because of that animus. And we simply don't think there's sufficient evidence to demonstrate that causal link in this case. And lastly, the administrative law judge's application of an adverse inference based on the missing witness rule was not harmless error. It was based on erroneous conclusions that Guggia spoke for the company when she stated her personal beliefs and that Natural Light stipulated to protect a concerted activity. But those conclusions were false. Without these erroneous conclusions, the only support for the decision comes from the adverse inference. Therefore, the board's error was, in fact, prejudicial as it resulted in a decision against Natural Light. Thank you, Your Honor. I would say the rest of your time for rebuttal we'll hear now from Mr. Heller. May it please the court. Joel Heller for the National Labor Relations Board. Your Honors, this is a straightforward retaliation case. Substantial evidence supports the board's finding that Natural Light discharged its entire sales department after they repeatedly voiced shared concerns about wages and other working conditions. Natural Light largely ignores that evidence and much of the board's findings and relies instead simply on its own preferred version of the facts. But the credited evidence shows that sales employees consistently were bringing group complaints to management in the months leading up to the discharge. For example, related to the issue of eliminating the opener's position, the credited testimony was that at the meeting where that change was announced, employees, quote, everyone complained. And in subsequent meetings, quote, they complained as a group to management about this issue. They spoke with each other about going to the board or going to an attorney. And employees raised that issue with management. They brought it to Finley. They brought it to Stoyanov. Everyone was aware of what was going on. And Natural Light focuses on the stipulations it entered into. And, of course, for the reasons described in our brief, the board reasonably relied on those stipulations. But that's not all it relied on. So the stipulation issue is really a red herring because there's ample evidence of concerted activity in the record wholly apart from those stipulations. And as we see from the transcript and the recording, GUGIA directly linked the closure of the sales department to that particular activity. Now, we have a recording, so Natural Light can't deny that any of those statements were made. All it argues is that GUGIA wasn't speaking on behalf of management. But that position is not supported by the record either. GUGIA had actual authority from Stoyanov, the president of the company, to lead this meeting, to address the employees, and to tell them about the closure of the sales department and that they were all being fired. And when asked directly at the hearing whether Linda, GUGIA, he was – Stoyanov, the president, was asked, did Linda represent you as far as why the room was closing? And his answer, yes, that's at Exhibits of Record 294. So we have direct evidence of actual authority here in which she was speaking on behalf of management. And Stoyanov was at the hearing. He never disavowed this in his testimony. GUGIA never stated either at the July 27th meeting itself or at the hearing. He never said she was only speaking in her personal opinion. He was conveying a message from upper management. And Natural Light talks about the use of the word I at certain points in the transcript. But there are other points in the transcript where she uses the word we. And she's speaking generally to all employees, saying things like, you guys know what you've been doing. People have been complaining. This is what happens when you have angry people all the time. So really it's a question of looking at the evidence. And as Judge Collins and Judge Bastian noted, as long as there is – Natural Light presents perhaps one view of the evidence, but the board, relying on the administrative lodger's findings, found to the contrary. And that is what substantial evidence the standard of review requires. The board's findings that GUGIA was acting on behalf of management are well supported. And of course it was no surprise to employees that she was speaking on behalf of management because she had done so before. There were prior instances in which she led meetings, in which she announced company policies. So employees would reasonably believe that she was speaking on behalf of management. So you have both apparent authority and actual authority for her statements. And the connection between the discharges and the protected activity is thus the statements made by Natural Life. And Natural Life itself is liable for the unlawful discharges. Now, Natural Life in its brief, but not in its argument today, puts forward its views of alternative reasons for the discharges. But the board reasonably found that those were protectional. It considered and rejected the economic argument, for example, for the reasons explained in our brief. This company, according to Stoyanov himself, had long been unprofitable and had been suffering, quote, unimaginable losses for years at a time before the discharge. So it was simply not credible that all of a sudden economics was the reason to discharge its entire sales force. And because the board considered that argument on the merits, there is no prejudice from the sanction the board issued for failure to comply with the subpoena, which, of course, was a correct ruling to begin with. And under the abuse of discretion standard for evidentiary rulings, Natural Life would have to show both error and prejudice, and it has shown neither. Briefly on the adverse inference that Natural Life referenced at the end. So the board concluded that there was an improper adverse inference and did not adopt it. But they found that there was harmless error. And the reason is because – well, let me back up. Natural Life misstates the scope of that adverse inference. All the adverse inference went to was the dates of Manager John's employment, whether he was still working after July 27th or not. And there's evidence, aside from that inference, that he was. So it's not necessary to any result. And, of course, the board found – and the dates of his employment go only to the argument, which Natural Life isn't even raising on anymore, really, that these discharges happened because there was going to be no supervisor employee on staff for a matter of days while Guggio was on a cruise. And the board found that that reason was pretextual, even apart from the dates of Finley's employment. So the adverse inference, which, again, only went to that small issue, really had no bearing on any finding of the board and thus was harmless error. I want to briefly address the other two violations that Natural Life started with. These violations, the impression of surveillance and the threat, are not properly before the court because the Natural Life did not follow the board's rules and regulations as to how to raise them before the board. Well, now, they recounted in their reply brief. They have block quoted the various exceptions that they made below to the ALJ's decision. And they seem – you know, they're concise, but they seem to cover the specific points. And it seemed to me, reading that, that the lack of additional detail, you know, doesn't strike me as problematic because of the overlap between the issues. So why – it seemed that when you say there isn't substantial evidence for these, you're just sort of incorporating everything else set on the main charge. Why is that – why am I wrong in reading it that way? Sure. Well, two points to that, Judge Collins. The first is that – so the block quotes are from the exceptions document, but they also filed an exceptions brief. And the board's rules are that when you file an exceptions brief, any brief in support of exceptions must contain an argument. And the two violations, the impression of surveillance and the threat, are not mentioned in the exceptions brief at all. There's a long list of numbers at the beginning, and they do say 19 and 30, but it's within the context of maybe 25 or 26 numbers. Those violations are never mentioned by name, let alone any substantive argument as to those violations. So even though it's clear from the – you know, from the record as a whole and from, you know, the brief and the other document what the grounds are, I mean, is this assignment as rule that, you know, it was there, but you didn't say the magic words? Is that what this is? Well, they didn't raise it properly. And there's kind of a principle of administrative law is that when you have an issue with an agency's ruling, you have to raise it at the proper time and in the proper manner. And they didn't do that because they didn't raise it in their exceptions brief. But my second point is that – well, a two-point second. The first is that this is an argument that the board was incorrect to disregard the exceptions on these two violations as improper. But in order to preserve that argument, Natural Life needed to file a motion for reconsideration because the board's finding at footnote one in its opinion – or sorry, footnote three, that it was going to disregard those exceptions. That issue came for the first time in the board's decision itself. And the law is clear from the Supreme Court and this court. In order to preserve an issue that arises for the first time in the board's decision, you have to file a motion for reconsideration. And Natural Life didn't do so. So if it wants to challenge the board's decision to disregard its exceptions, it needs to file a motion for reconsideration. And the second point – and you brought this up at the very beginning, Judge Collins, of your question – is that these are arguments that are appearing for the first time in the reply brief. So in addition to the barrier from Section 10e of the Act, the jurisdictional bar to raising these issues, there's also appellate forfeiture because they didn't raise this issue in their opening brief. So really for those three reasons, the issue is not properly before the court and the board is entitled to some reinforcement as to those two violations. So what would it mean for some reinforcement of those? Would those be sufficient to sustain all the relief independently of the other charge? No, because from the discharge, the remedy for that is reinstatement and back pay and make whole relief. The remedy for the impression of surveillance and the threat would be a cease and desist order and a notice posting. So there are separate remedies for the separate violations. Some reinforcement for those first two and then substantial evidence supporting the discharge violation. And that's why you get full enforcement of the board's decision. Absent any further questions, I will ask that the court enforce the board's order in full. Thank you. Thank you, counsel. We have just over two minutes left for Mr. Fountain. Thank you, Your Honor. And I'll just make a couple of brief points. With respect to the issue about Ms. Guggia having actual authority from Mr. Stoyanov, he did testify that she had authority to convey the reasons for the terminations. But that doesn't mean he gave her authority to confer reasons that were not the company's reasons. She certainly had authority to convey the company's reasons, but our position is she went way beyond that, and she started getting into her own personal opinions about the reasons for the terminations. And we don't believe natural life should be bound by the personal opinions of one employee who the board admits was not a supervisory employee, although she had at times performed supervisory functions. With respect to the alternative reasons for shutting down the sales department, natural life's position was, well, because the sales staff was terminated because they simply weren't profitable and hadn't been profitable for a long time. And the board says, well, that's not a valid reason because if the division of the company is unprofitable, you shut it down immediately. But I think the board assumes too much. I mean, it's certainly plausible that Mr. Stoyanov was trying to keep this company alive for a long time, was trying to keep the sales division alive for a long time, and simply got to the point where he decided something needed to change. He's the owner of the company, and he has the discretion to do that for financial reasons that have nothing to do with animus. So I do think that there is an alternative argument there. With respect to the natural life's post-hearing brief and whether it raised these issues below, contrary to the board's statement on the matter, the post-hearing brief did discuss. All right. Thank you, counsel. Your time has expired. Your time has expired. Thank you. We thank both the counsels for their arguments this morning. And the case just argued will be submitted. And that concludes our session for this morning.
judges: Bybee, Bastian, Collins